Thank you, Your Honors. May it please the Court, Narain Kumar for Plaintiff Appellant Nora Gutierrez. I'd like to reserve four minutes of my time. Okay, please watch the clock. So if I could, I'd like to begin with the first issue presented on appeal, the question of interception under Clause 631A, Clause 1, and whether or not it applies to the Internet. The district court decided and held that it does not. The sort of the plain meaning, in a sense, as it was applying it, that the phrase telephone and telegraph and telephone communications is often been used and was in fact cited by the district court, but the actual language is certainly much broader. It applies to any telegraph or telephone wire, line, cable, or instrument, and we think that this language in our case is dispositive. Can you explain how Salesforce actually works? I did look at the two experts' declarations, but was left as confused as I came, so maybe you could tell us in simple language, because I know Internet can sometimes be spread over telecommunications lines, so can you explain us how that works? Sure, of course, Your Honor. So Nora Gutierrez types a query, a question into the little search pop-up on Nike, or in this case, Converse's website. In our home computer or wherever. It could be on her home computer, it could be on a cell phone. Yes, and in this case, it's undisputed that it was on her cell phone. Okay. And so you go to the website, there's a little sort of, I don't want to quite say pop-up, but it is part of the website there, where then you can put in, type in whatever your question is, and then that question is transmitted to Salesforce's website. And how is it transmitted, in what way? So I have my cell phone, I type on my cell phone, you know, to me, is this magic, magically, but how does it actually work? It's, as my understanding, it's going to generally be transmitted through data, through the... Does it go to a cell tower, does it go to a repeater, where does it go? It's eventually, it's going to a cell tower. It's, well, it, I guess, let me correct myself, it may depend on whether or not you're on your, on a Wi-Fi network, or you are sort of using cellular data provided by a third-party company. Do we know what it was in this case? In this case, I would, I'd have to double check, but I believe it was her home Wi-Fi. So it goes to the home Wi-Fi, then where does that go? The home Wi-Fi will then send it to the... Over wires? Is it over wires, or is it through radio signals? How does it go? It will be, it'll be through some, I guess, radio signal, in a sense. It's going to be some form of wireless communication to her home router, and then her home router is going to, is obviously plugged into the, usually, most often network cable line, which will go directly to her internet service provider, who will then, you know, through the sort of series of tubes that is the internet, get that to Converse's website. So the cable is a wire, or is it something else? The cable will be a wire, yes. Okay. Your home cable, you know, your home internet line is usually coming now through a physical cable. There is certainly a cable that is connecting you and your internet service provider. Is that different than if I make a telephone call, or does that work the same way? She's in her house, she makes a call. In our view, it's exactly the same. Whether or not it's coming through your home, through a sort of a cable or a cable line, or, you know, a more traditional landline telephone. In fact, to us, there's no meaningful distinction. Where does Salesforce intersect with that? So when she types in her message, it goes from her computer, or from her phone in this case, to, directly to Salesforce. It goes over the wire, or goes through the Wi-Fi, or has it go directly to Salesforce? Well, it will go, in fact, in this case, probably over both. It'll go over wires and over wireless. And it will then be transmitted to her, in this case, her ISP. And then that will transmit it to Salesforce. Okay. Over cables. Over wire. Okay. And, Council, the 631 feels a little wrenched here. It's clear it was adopted in 1967. It's a different technological background. They were concerned about eavesdropping, references to telephones, telegraphs. Really feels very anachronistic. California has amended its statutes. And you have other causes of action you might have brought. You might have brought one under 1798. You might have brought one under, it looks like, 632-01. Those are much more recent California statutes that refer to the internet and provide causes of action for people who release information that's obtained over the internet. Why should we hold that 631 applies to the internet? I appreciate the question, Your Honor. And so we're specifically talking about Clause 1 here. And because there's no dispute, at least in this case, that Clauses 2 and 3 certainly can apply to the internet. And so for Clause 1, certainly to some degree, telegraph isn't the language that seems the most technologically up-to-date. But certainly the fact that the legislature has updated all of these, in some cases, updated other references. And in the case of 631-A, 631-A has in fact also specified, you know, through its exceptions, more recent technology. Suggests that the legislature is certainly aware of and has no problem continuing to apply these phrases according to, you know, their plain meaning. Well, yeah, but plain meaning, this is telephone and telegraph. I just, I mean, it just, again, it just feels really, really wrenched here when what they're concerned with is eavesdropping on a 1967 that had a particular, that had a particular understanding. And when California, when the California legislature addresses the internet and communications that are leaked from the internet to third parties and creates causes of action, it feels like this one is really wrenched. I'm sort of curious because it looks like there are other statutes where you might have had, you might have had a good cause of action. So I think the important part of the statute is that the California legislature hasn't specified to some, to the, just, you know, telegraph or telephone. It's in fact specifying specific devices and aspects of the technology which it's trying to protect. And here it's in fact protecting telephone instruments, which we think is the most salient point. Because the statute is telegraph or telephone wire, line, cable, or instrument. And so we think that, in fact, that plain language very clearly has to cover other things which are telephone instruments like an iPhone. And we think that there is no real distinction or way in the statute to parse an iPhone using a tele... Do you have any, do you have any California cases that have, that have held that one applies to the internet? I don't believe that we have, there's any appellate authority in California on this. And a split authority among the, among federal district courts on this one? Yes, Your Honor. Okay. And our loose statement in Javier. As well as, yes, as well as the statement in Javier. Yes. So are you saying that the claim depends on whether the person accesses the website through a cell phone versus through a desktop computer? That is not our position. Our position is the fact that there is, that a telephone instrument is clearly encompassed within the plain text of the statute there. Means that if an iPhone is covered... So basically your argument is if they access the website through a cell phone, it's a really easy question. But if they access it through a desktop, we still win. Yes, exactly, Your Honor. And the fact that it really doesn't seem like the California legislature had any intent to sort of parse out exactly the type of, you know, oh, well, this is coming from this sort of device. And then this, you know, it looks a little bit different here, but it's the identical communication. We don't think that given SIPA's broad purpose in protecting privacy and protecting California consumers, that it really makes any sense to sort of prohibit or, you know, differentiate claims where this exact same identical communication, you know, with privacy violated in the exact same way is covered under 631A, Clause 1, if it is on an iPhone. But, you know, if it's done on an iPad, it might be a completely different analysis. So I think really sort of the only holistic way to read this entire section as a whole is to say that it's to understand that it does encompass the internet. It does encompass all of these communications. I have some confusion that Judge Akuta has mentioned in terms of just the technology. So I just want to... Does a cell phone, when you access a website from a cell phone versus when you access a website from a laptop connected to a Wi-Fi network, so there is no wire going to the laptop, what is the difference? Is there one? I mean, I think in both cases, those communications are touching wires. Those communications, by the time they get to the other end of conversation, have gone through many, many wires. So your argument isn't so simplistic as, if I'm accessing a website from a phone, of course, the statute is triggered because it's a telephone. No, we think that is actually, in fact, a part of our argument. If you're using a telephone instrument, then your conversation is protected from interception. But there's no dial-up here. Nobody's using the phone. If this was an iPhone, nobody's on the iPhone touching numbers in order to call sort of a phone-to-phone service. You're going to Safari or you're going to Google. Yes, you are. And accessing that. So what you've got is a handheld computer. If you can't answer Judge Forrest's question about the desktop, as being plainly covered, then why is a handheld desktop? And maybe it's just been misnamed by Apple. Well, we think, I apologize if I misspoke. We do think that a desktop is going to be covered under this. And we think that it really is. Because it's a telephone line? It's a telegraph line? I think certainly it would be analogous, as we point out in our brief. It is certainly analogous to a modern telegraph of transmitting ones and zeros in text. Is essentially the conversation that was occurring here. But we also think that it's sort of the only sort of rational way to interpret the statute. Once we accept that a telephone instrument covers an iPhone, the phrase telephone instrument doesn't sort of... Why wouldn't it be rational to interpret the statute to apply only to what it applied to in 1967? And look to the other statutes that California has recently adopted that refer specifically to the internet and social media and provide causes of action for people disclosing matters to third parties. Because the statute is very clear and just by the plain language covers a telephone instrument. And that isn't specifying telephone instruments when it's using a telephone landline or a wire telephone signal or anything else. It is a California intended to protect telephone instruments being used. And an iPhone is clearly a telephone instrument. So the legislature clearly intended for that to be covered no matter how it was being used here and sort of the specifics of the technology. And the fact that indeed the legislature has amended the statute clearly expresses the understanding that certain, you know, for example, voice over internet protocol telephone calls under the opposing side's view would not be covered because they're using the internet. And those look and feel exactly like telephone calls. If a telephone call... You want to take some time for rebuttal? Oh, yes. I'd like to reserve my remaining two minutes for rebuttal. Thank you. If it may please the court, my name is Michael Roth and I represent the defendant and appellee Converse, Inc. What you just heard was very complicated, but affirming the district court's decision here is very straightforward because there's one thing that sets this case apart from every other SEPA case that's been filed. Hundreds of SEPA cases that have been filed after Javier and that's because this case went to summary judgment. And nothing you just heard is in the record. The district court's summary judgment ruling can be affirmed for two very simple reasons. Number one, as a matter of plain meaning and as a matter of evidence, the internet doesn't involve telephone and telegraph technologies. And number two, there was no evidence at all, not a scintilla of evidence that Salesforce read or had access to Ms. Gutierrez's chat message with Converse and certainly not while it was in transit and in real time. With respect to your first point, can you explain why it's not a telecommunication system? At some point, the information from the phone goes over wires that are telecommunication-wide. I can do my best. And I will also say that the only evidence in the record about this was from Converse's expert who did opine, and this is at ER 128, that communications over the internet that are initiated from a mobile device through a Wi-Fi network do not implicate telephone and telegraph technologies. And I think they're fundamentally different technologies. But I know I pay for spectrum. It's both my cable and my telephone and everything else. And so presumably they have one line that the information is going through, but I don't know. Well, currently you're paying for a bundled service. There have been times where you paid for all of those services separately. And there have been times when, I'm old enough to remember this, when you would actually access the internet through your telephone line, which you don't do anymore. It's accessed through radio waves and fiber optic cables. There are cables involved. And our phone service goes through something completely different or what? I mean, I don't have a landline. Only my parents would have had a landline. There are different types of phones. There are landlines, which obviously are going through wires and connecting through a switching station, which is owned by third parties. If you're using a cellular device, it connects either through your Wi-Fi or through your cell phone and ultimately goes through wires to a cellular tower. Those cellular towers are owned by third parties. They lease space to your cell phone provider. So you'll have AT&T and Verizon and multiple providers who are all leasing space. And then they will direct that through another wire. I mean, it's cellular, right? The idea of cellular is like our planet is divided into cells. And there's a tower at each point. And it's connecting from tower to tower almost instantly. But the key part of it, about a telephone conversation, is it's communicating your voice. And the way the statute's written, it's communicating your voice over wires, lines, and cables. And this is a wiretapping statute. So the other side says, what about voice over internet protocol, VOIP? That's not using a telephone or telegraph device. I don't think it matters that an iPhone is named an iPhone. An iPhone's also a camera. It's also a gaming device. What you're using to use your iPhone to connect to the internet, you have to access an app. This is your web browser. This is Safari. This is Chrome. Without that, you can't connect to the internet. If you open up the telephone app on your iPhone, you can't connect to the internet. You can't make a connection. Send data in packets, encrypted data, through the HTTPS protocol. It just doesn't happen, right? It's your voice. Your voice hits wires, transfers through the wires to cellular towers, and is communicated to other phones through those cellular towers. Is that not an internal telephone communication system, which is in 631A clause 1? I think an internal telephone communication system has to do with internal within a building, for example. It's referring to something totally different. This is if you're making inter-office calls. And it's a wiretapping statute from 1967. What it criminalizes is making a tap into those forms of connecting to phones or to telegraphs. What we have here is an app. It's a web-based SaaS software that connects to people communicating. It's not intercepting it. It's forming the connection, allowing two packets, multiple packets of information that are all encrypted to travel through the cloud and shake hands and meet each other so there can be a communication. This is actually facilitating the communication. It's not an interception by a third party. I think, Judge Vivey, you referred to a split in district courts on how to read the statute. I think that's a generous reading. There have been hundreds of these cases after Javier. We provided you with over two pages of cases saying, as a matter of plain statutory interpretation, Clause 1 doesn't apply to the internet. There have been two decisions that said Clause 1 applies to the internet. One was this case in front of Judge Klausner when it was first filed. And then when it was reassigned to Judge Cotto, she looked at the evidence and she looked at the other decisions and changed that decision. And the other one was Kaufman. And Kaufman just relied on Javier. And Judge Klausner just relied on Javier. And Javier looked at Clause 2 of CEPA to say that it applies to the internet. And do you think Clause 2 does apply to the internet? I think Clause 2 applies to communications. And it's definitely written broader. And it can refer to the communications while they're in transit or it can refer to the communications as they're being sent or received. But it has a contemporaneous requirement. I think that because the internet is involved, it doesn't immunize you to liability under Clause 2. And that's why I reached summary judgment here. And Plaintiff was required to put in evidence that that communication was being intercepted in real time by Salesforce. And they didn't do that. There wasn't a single piece of evidence that Salesforce was intercepting the communication in real time. The primary piece of evidence they relied on was their expert. But this wasn't a battle of the experts. The experts' entire opinion is eight pages. It was submitted in the context of class certification. And it raised issues that could be common to the class. I didn't answer a single one of those. You can read the entire declaration. It doesn't mention Ms. Gutierrez. It doesn't mention her chat communication. And it certainly doesn't say that Salesforce read that chat communication while it was in transit. So I understood the argument. Salesforce didn't read the chat information because it had agreed not to. In other words, it was a contractual thing. It wasn't that they were foreclosed from reading it. It was contractual and technological. This is SaaS software that sits in the cloud. And it's segmented. So Converse's instance of the service cloud is siloed. So there are many companies that can contract with Salesforce. You have your separate piece of the service cloud. And Salesforce, by contract and technologically, can't access Converse's piece of the service cloud. So technologically, I think the argument was, well, they encrypted it. But of course, whatever Salesforce encrypted, they cannot encrypt also, unless they're foreclosed by contract. Well, Salesforce can only unencrypt it if it has the key to unencrypt it. And that key is given to Converse by contract. It's not just a contractual obligation they have to abide by. There actually has to be a physical transfer. Someone says, here's the code. I'm giving you the keys so that you can decipher this encrypted information. And all of the evidence was that that did not happen. Converse said it didn't happen. Salesforce said it didn't happen. The contracts say it couldn't happen. The audits that Converse ran said it didn't happen. This was a very straightforward issue on summary judgment. I mean, there just was no evidence at all that Salesforce was reading, attempting to read, or could read a communication while it was in transit. And it has to be real time also. So there's a difference between Salesforce and its software and what's being recorded. There's nobody at Salesforce who's jumping in and breaking into Converse's access, Converse's siloed section of the service cloud, and learning anything in real time. There's a customer service representative who's having a real time conversation with Ms. Gutierrez. She types in six words to generate a claim. And this is a made up claim. And then sues Converse for company killing statutory damages. This is why none of these cases make it to summary judgment, and why this one did. Because the company said enough of this already. That Javier doesn't apply to every third party software used on the internet. It doesn't apply when somebody hosts your website. This is a wiretapping and eavesdropping statute. There's $5,000 in statutory damages for every violation, and about a million people who access Converse's website during the statute of limitations. That's a $5 billion claim for helping customers, for providing customer service and support. That's not what this statute was supposed to do. This is a total misuse of the statute. And it made it to summary judgment, and it was an evidentiary burden. And it was an evidentiary burden to say that telephone and telegraph technologies were in use and being tapped, and there was no evidence of that at all. So whether you agree with the district court and every other district court, this is dozens of judges in every district in California who have said the first clause doesn't apply to the internet, whether you treat it as a matter of statutory interpretation or a matter of evidence, there was no claim under the first clause. As to the second clause, there were three pieces of evidence. There's this declaration from the expert who doesn't mention Gutierrez. He says there are the presence of uniform identifiers, UUIDs, that could in theory allow Salesforce to connect the dots between different data sets, but doesn't say that that ever happened, didn't happen with Ms. Gutierrez. It doesn't explain what that means. And then they refer to a login spreadsheet, which they didn't even bother to put in the excerpts of record. And that was just, the only testimony about that was that it gave Salesforce access, if requested, to provide technological support. There's no evidence that that ever happened. The evidence was the opposite, that that permission was never granted. That's the key, Judge Akuta, that Congress never gave Salesforce the key to read any of its communications. What Congress' expert opined was that it was virtually impossible to read an internet communication while it's in transit. And this has to do with both the internet protocols and encryption. It creates a cipher. And the plaintiff had to put in evidence that that was read in transits, that somehow someone broke into that. And they just passed over that burden completely. Unless there are specific questions, I'll just wrap up. This, I've said it before, this case was decided on summary judgment. I think it's a straightforward case. It's a straightforward case of statutory interpretation. It's a straightforward case of the evidence. Javier was an unpublished decision. It unleashed a tidal wave of these cases. It's overwhelmed the California district courts. And it's forced companies to make a choice. Do we face company-killing statutory damages based on this bizarre interpretation of a 1967 wiretapping statute? Or do we pay a small amount of money and make it go away? And the evidence in this case was that misdemeanors had done that 27 times before suing Converse and then continued to do it after suing Converse. This is just a shakedown. And the court has the opportunity not just to affirm summary judgment here, which I think is an easy call, but also recognize that there are guardrails built into the statute. And in particular, built into Clause 1 that doesn't allow plaintiffs to take advantage of these provisions. Thank you. You have some time left, Reba. Thank you. Thank you, Your Honors. I wanted to sort of start with point two here, the second issue raised by plaintiffs in the appeal here. And the real answer is that there certainly was evidence that the district court just sort of chose to ignore. As mentioned, there was a spreadsheet that was a list of who Converse had given access to for all of this sensitive information. Is that spreadsheet in the record? I thought it was, but I would not, after counsel's representation, that it was not. We couldn't find it. Then I believe it was not. It was certainly described in the district court opinion. And all of the relevant aspects of it are just verbatim from the district court's opinion on page five. Obviously, there's nothing else sort of that we need beyond it what was just verbatim quoted by the district court. And so, because the honest truth is they gave it, the district court gave, sort of Converse gave access to Salesforce email addresses that had direct access to it. So for all of Salesforce protests of they couldn't do this, you know, contract and blah, blah, blah, all of that is contingent on if you had not given them direct access. You gave them the keys. So, of course, Salesforce could do that. Or at least, of course, a reasonable jury could conclude that because Salesforce hadn't present, or Converse has not presented any reason or explanation for why these email addresses were there. Does the success of your case turn on whether Salesforce, in fact, accessed her records? I don't believe. It's just enough that it was available, but even if they didn't look at it? The purpose of summary judgment, yes. At trial, it might be perhaps a little bit different, but that wasn't the grounds. I thought summary judgment was going to be your opportunity to tell the district court what all the evidence was. Converse didn't move on that issue for summary judgment. For example. What could a jury decide if you haven't put in any evidence that suggests that? And if you've got an expert who says, yes, Salesforce did, and they put in an expert says, no, Salesforce didn't, then we've got a jury issue. So, for example, the UUIDs, which were just referenced, were grounds that a jury could find that, yes, Salesforce had, in fact, read this and did, in fact, access this because Salesforce was creating unique keys that would allow it to use this information presented in one service program and in a different aspect. On the first point about the technology question that we asked you a lot about in your initial argument, can you point me to the pages in the record that you want us to be sure to look at in determining whether you proved that the internet qualifies as a telephonic wire communication? I think for us, the answer is just as simple as, is an iPhone a telephone instrument? So you just want us to take our sort of generalized knowledge of the internet and phones and make that call, not as a matter of evidence? I mean, there was certainly, we did, there was undisputed evidence that an iPhone is a telephone, but I don't really think that it's a matter of evidence as much as it is just common sense. Okay, thanks. Thank you. Thank you. The case of Gutierrez v. Converse is submitted.
judges: BYBEE, IKUTA, FORREST